# UNITED STATES BANKRUPTCY COURT
## FOR THE
## DISTRICT OF MASSACHUSETTS

~~~~~~~~~~~~~~~~~~~~~~~~~~

In re
**MATTEO D'ANELLO,**                         Chapter 13
     Debtor                            Case No. 10-21719-JNF

~~~~~~~~~~~~~~~~~~~~~~~~~~

**LACOURSE BUILDERS, LLC**
     Plaintiff
v.                                           Adv. P. No. 11-1040
**MATTEO D'ANELLO,**
     Defendant

~~~~~~~~~~~~~~~~~~~~~~~~~~

## MEMORANDUM

## I. INTRODUCTION

The matter before the Court is the adversary proceeding commenced by Lacourse

Builders, LLC ("Lacourse Builders") against Matteo D'Anello ("Mr. D'Anello" or the

"Debtor"), through which it seeks to except a debt from discharge pursuant to 11 U.S.C. §

523(a)(4). The Court conducted a trial on May 2, 2012 at which two witnesses testified,

Kenneth Lacourse ("Mr. Lacourse") and Andrew C. Fantasia, C.P.A., ABV, CVA and CFF

("Mr. Fantasia"),[1] and six exhibits were introduced into evidence. Mr. D'Anello did not

attend or testify at the trial. Although Lacourse Builders did not subpoena him to testify,

---

[1] Mr. Fantasia, in addition to being a certified public accountant (CPA), is accredited in business valuation (ABV), is certified in valuation analyses (CVA), and is certified in financial forensics (CFF).

the Debtor in the parties' Joint Pretrial Memorandum, represented that "[t]he Defendant

. . . expects to testify on his own behalf."

The Court now makes its findings of fact and conclusions of law in accordance with

Fed. R. Bankr. P. 7052.

## II. FACTS

The Debtor filed a voluntary Chapter 13 petition on October 27, 2010.  He listed

Lacourse Builders as the holder of a contingent and unliquidated claim in the sum of

$172,000 on Schedule F-Creditors Holding Unsecured Nonpriority Claims.  Lacourse

Builders timely filed a complaint to except that debt from discharge.

The Plaintiff, Lacourse Builders, a Massachusetts limited liability company, brought

its Complaint through Mr. Lacourse, its manager on its own behalf and derivatively on

behalf of Crestwood Builders, LLC ("Crestwood Builders").  Lacourse Builders was a

member of Crestwood Builders.  MD Management, LLC ("MD Management") was its only

other member.  Crestwood Builders was a limited liability company organized under the

laws of the Commonwealth of Massachusetts.  Its manager was Mr. D'Anello.  Lacourse

Builders, through Mr. Lacourse, and Mr. D'Anello were involved in a joint venture to

develop real estate in Framingham through their limited liability companies.

Specifically, on or about December 26, 2007, Lacourse Builders and MD

Management, a limited liability company whose manager was the Debtor's spouse, Adele

D'Anello, and whose SOC [Secretary of the Commonwealth] signatory was Paul A.

D'Anello, formed Crestwood Builders and entered into a written Operating Agreement

(the "Agreement") to govern their duties and obligations to each other.  Pursuant to the Operating Agreement, MD Management and Lacourse Builders were equal members of Crestwood Builders. The Debtor served as the sole manager of Crestwood Builders whose intended purpose was the acquisition, development and sale of real estate.  Mr. Fantasia, in a report dated September 21, 2009 (Plaintiff's Exhibit 6), indicated that "[t]he initial and only project developed [by Crestwood Builders] was land located at 567 Winter Street in Framingham, MA.  The land was appraised on March 11, 2008 by Joseph R. Evangelista, RAS.  His report indicated the real estate had an appraised value of $1,000,000.  The land was to be subdivided into three lots."

Lacourse Builders was responsible for the construction of homes on land purchased by Crestwood Builders; and Mr. D'Anello was responsible for keeping and maintaining the books, records and accounts of Crestwood Builders, including all checking accounts and financial records.  Mr. Lacourse described the arrangement succinctly: "He [Mr. D'Anello] would handle all the books, the payments of the subs, any of the daily bookkeeping of the company, and I would handle all the site visits, site construction costs, outside construction, and scheduling of the subcontractors."  In other words, Mr. Lacourse scheduled and hired the subcontractors and ordered the materials, while Mr. D'Anello paid the invoices submitted for materials and labor.  Mr. D'Anello, as the manager, had the sole check writing authority.

Crestwood Builders developed and constructed three residences in Framingham, Massachusetts, at least two of which sold for over $1.0 million.  As discussed in more detail

3

below, it obtained financing for the acquisition of the land and construction costs from

Heritage Hill Finance.  In addition to his responsibilities for managing the finances of

Crestwood Builders, Mr. D'Anello was involved with the sale of that property, engaging

a broker and attending the closing on its behalf.

Mr. Lacourse testified, however, that after the construction of the first home,

problems arose.  He stated:

> After the first house was completed, Lot 3, we moved all our operation over
> to the second lot. Halfway through I got a lot of complaint calls from the
> subcontractors saying they weren't getting paid. When I confronted Mr.
> D'Anello about it, he had said that he would take care of it, he'll look into it.
> Couple weeks, a month went by. I requested a look at the books to see why
> these guys weren't getting paid and he just basically said that he just didn't
> have the money in the account to pay them and I requested the books
> otherwise our project was going to stop because these guys were going to
> walk off and leave the development.

<div align="center">***</div>

> I had asked him why the subcontractors weren't getting paid. They were
> getting pretty upset and they threatened to lien the project if they didn't get
> paid. He had said, "I'll take care of it. Let me see who they are." I gave him
> the names of the people that hadn't get -- hadn't been paid and we left it
> alone at that stage of it.

Despite the efforts of Mr. Lacourse, the subcontractors remained unpaid and the progress

on the project slowed.[2]

Mr. Lacourse made a more formal demand on Mr. D'Anello to examine the books

---

[2] Mr. Fantasia reported that a house on Lot 3 was sold on October 30, 2008 for a
purchase price of $1,038,470; a house on Lot 2 was sold on June 30, 2009, following
modification of a preliminary injunction issued by the Superior Court on June 2, 2009,
for $1,205,151.33.

<div align="center">4</div>

and records of Crestwood Builders, but he failed to respond.  Lacourse Builders engaged

counsel and then commenced legal action against Mr. D'Anello and MD Management on

February 24, 2009 by filing a complaint in the Middlesex Superior Court, Department of the

Trial Court, CA No. 2009-00717.[3]  It obtained injunctive relief ordering the Debtor to turn

over the books, records and documents requested by Lacourse Builders.  On April 16, 2009,

Lacourse Builders retained Mr. Fantasia, a forensic accountant, to review books, records

and documents of Crestwood Builders turned over to Lacourse Builders by the Debtor.  Mr.

Fantasia determined that there were serious and substantial monies improperly and

inappropriately taken and misused by Mr. D'Anello for his own purpose and benefit and

not for the business purposes of Crestwood Builders.  In the Superior Court action, the

parties agreed to a settlement, but the Debtor failed to comply with its terms.  On April 30,

2010, the Superior Court entered an order enforcing the settlement agreement. The order,

which was docketed on May 4, 2010, provided the following:

> After hearing and upon review and consideration, this Court finds that the
> parties reached a settlement agreement in this action on or about December
> 2, 2009, and reported the case settled to the court on that date, which
> thereafter entered a decree nisi.  The terms of that agreement were (1) that
> the defendants would pay the plaintiff the sum of $215,000 (later amended
> to 218,000 [sic] by mutual agreement); (2) that this sum would be paid as
> follows:  $30,000 on or before March 13, 2010, $30,000 on or before June 15,
> 2010, $20,000 on or before September 15, 2010, and $125,000 on or before
> December 15, 2010; (3) that the settlement amoun d[sic] would be credited by
> $46,000 upon the release of a cash bond to the plaintiff; and (4) upon
> payment, the plaintiff would assume full responsibility to certain named

---

[3] Lacourse Builders also named Crestwood Builders as a defendant.  The state
court docket reflects that all defendants were defaulted, although Mr. D'Anello
answered the complaint for contempt filed on April 28, 2009.

subcontractors. Thereafter, the bond was released, but the defendants failed
to sign a settlement agreement containing these terms or make any payments
according to the agreed upon schedule, because of purported unexpected
business setbacks. The defendants have breached the oral settlement
agreement. Accordingly, it is hereby ORDERED that the plaintiff's motion to
enforce settlement agreement is ALLOWED, and the defendants shall pay
the balance of $172,000 as follows: $14,000 on or before June 15, 2010; $30,000
on or before September 15, 2010; and $138,000 on or before December 15,
2010.

The Debtor and MD Management failed to make the required payments, and Lacourse

Builders filed, on June 22, 2010, another complaint for contempt against Mr. D'Anello and

the other defendants for failing to comply with the order of the Superior Court. Shortly

before the trial scheduled for November 30, 2010 (rescheduled from October 14, 2010) was

to begin, Mr. D'Anello, on October 27, 2010, commenced his Chapter 13 case.

As a result of the legal action, Mr. Lacourse on behalf of Lacourse Builders learned

about "[n]umerous checks written against the account that had no involvement with [the]

Crestwood project whatsoever, numerous accounts [sic] that were written out towards

other projects that he [Mr. D'Anello] had going at the time." Mr. Lacourse, by way of

example, testified that checks were written to Gateway On The River, LLC, an entity with

whom Crestwood Builders had no involvement and for which there was no authorization

for payments totaling approximately $183,000.[4] Mr. Lacourse, while noting that Mr.

D'Anello had written checks to himself and to his wife, added:

There were a couple of checks written out to his nephew for about $7200 or
so, some checks that were written out to his daughter's boyfriend, which was

---

[4] At trial, neither party explained the ownership or capital structure of Gateway
On The River, LLC.

> doing some work for him on a couple other projects that he had, and
> probably about three or four other projects that he had, Charleton, West
> Brookfield -- Norfolk Field.

Lacourse Builders produced a list of checks signed by Mr. D'Anello made payable to

persons or entities that had nothing to do with the Crestwood Builders project. [Plaintiff's

Ex. 5]

      After Mr. Lacourse learned that checks were written to persons and entities

unaffiliated with Crestwood Builders or its project, he confronted Mr. D'Anello at the job

site in Framingham.  He stated:

> On the site he showed up on the site and I had said -- after finding out all this
> was going on I said, "You have to come up with the money. We've got to get
> this finished. The bank is on our back about closing up these lots." He said
> that there's no way. He doesn't have any more money to do it and the bank
> is not going to fund him any more to get it done and that's when I had to step
> in and finish it.

In addition, Mr. Lacourse learned that a second mortgage had been placed on one of the

lots.  He explained:

> I had a meeting with Clea Blair, which [sic] is the president of Heritage Hill
> Finance. He was the lender of the project. He came down. Met with him at
> the site, walked through Lot 2, which was on One Crest Road. Clea ended up
> telling me that there was an outstanding balance of $150,000 that Matteo
> agreed to pay him back at the sale of the final house being developed. I had
> no idea whatsoever and it came to me as a shock. It was -- ended up the
> Heritage Hill put a second loan that I had no involvement on on Lot 3 [sic].

Mr. Lacourse testified that the parties had contemplated that, after the completion of the

homes on Lots 1 and 2, Crestwood Builders would have minimal debt of approximately

$50,000 on Lot 3.  As a result of the additional mortgage, however, he stated that there was

"a $250,000 debt on Lot 3 so we [Lacourse Builders] ended up finishing it." He added:

"Heritage Hill fronted I think it was 80 percent loan of value on it [sic]. It was for $450,000

so 80 percent of that is what he [Clea Blair of Heritage Hill Finance] financed and I had to

come up with the difference to finish the project." In short, Lacourse Builders finished the

project (both Lots 1 and 2) for Crestwood Builders. As part of the settlement agreement in

the Superior Court litigation, the Debtor agreed to turn over Lot 1 to Lacourse Builders.

As noted above, Crestwood Builders was funded with loans from private sources.

Crestwood Builders obtained three loans from Heritage Hill Finance:  a $750,000 loan of

which $747,000 was released; a $500,000 loan used to construct the first house on Lot 3; and

a $900,000 loan used to construct a house on Lot 2 of which $658,982.89 was disbursed. The

proceeds of that loan were used to make interest payments on the outstanding loans and

to pay material suppliers, in particular Wachusett Lumber & Building Supply, Inc.

("Wachusett Lumber"). As a result of the actions of the Debtor, Mr. Lacourse testified that

he infused "pretty close to about $150,000 to $200,000" into the project on behalf of

Lacourse Builders.

Mr. Fantasia provided a detailed report based upon documents obtained from Mr.

D'Anello, his  attorney, Mr. Lacourse, the attorney for Lacourse Builders, Heritage Hill

Finance, the closing attorney for Heritage Hill Finance, and other individuals as well as the

Office of the Secretary of State for the Commonwealth of Massachusetts. He listed

numerous documents and sources, including the Citizens Bank account of Crestwood

Builders, in his report from which he gleaned information.  Based upon the extensive

8

documentation he collected, Mr. Fantasia prepared Excel spreadsheets to document cash receipts and disbursements with the following captions: 1) Analysis of Land Note Payable: Advances, Interest Payments and Note Repayment; 2) Analysis of Lot #3 Note Payable: Advances, Interest Payments and Note Repayment; 3) Analysis of Lot #2 Note Payable: Advances, Interest Payments and Note Repayment; 4) Summary of Loans Issued and Related Payments; 5) Transaction Detail by Account: Citizens Bank Account; 6) Schedule of Funds Due from Matteo D'Anello; and 7) an Interest Rate Calculation for the unauthorized payments.  The spreadsheet relating to the funds due from the Debtor contained columns for the check number, the check date, a description/payee, comments, the check amount, as well as the total amount of checks made payable to Gateway On The River, LLC, Matteo D'Anello, the Winchendon Project, the Town of Holliston, the North Brookfield Project, Joseph Podermo,[5] the Ashland Project, the Charleton Project, the Upton Project, the Northboro Project and the Leominister Project with appropriate adjustments. Following adjustments, Mr. Fantasia determined that Mr. D'Anello issued checks in the total sum of $290,787.13 made payable to individuals and entities who did not provide labor or materials or other services to  Crestwood  Builders. The largest recipient was Gateway On The River, LLC in the total amount of $183,487.35, adjusted to $147,123.38.

Mr. Fantasia found that as early as May 29, 2008, Mr. Lacourse was required to issue

---

[5] Mr. Lacourse described Joseph Podermo as a potential investor, adding that Mr. D'Anello "was trying to get in to do future projects."  He also added that the Debtor "mentioned to me that this guy was going to come in and finance some projects going forward.  I had no idea that he was actually paying this guy to come in to invest."

checks from his personal or other business accounts to vendors and subcontractors associated with the project. He determined that Mr. Lacourse expended $86,615.09 of his own funds ($175,615.09 less $89,000 of checks issued to him by Crestwood Builders). Additionally, Mr. Fantasia confirmed that on or about October 30, 2008, Mr. Lacourse requested Heritage Hill Finance to assume responsibility for paying project vendors and subcontractors from remaining available loan proceeds. Heritage Hill Finance routinely made direct payments to Wachusett Lumber because of a common ownership. Mr. Fantasia also found that Heritage Hill Finance advanced $150,000 to Mr. D'Anello for a construction project in Charlton, Massachusetts and then required Lacourse Builders to assume that obligation to induce it to continue funding the construction of the home on Lot 1 of the Framingham project.

Mr. Fantasia reported and testified that Crestwood Builders issued checks from only one bank account at Citizens Bank. He also stated that the Debtor, as the only person authorized to write checks from the account, wrote checks to himself or for his benefit between March 12, 2008 and February 27, 2009 and that the total of net unauthorized expenditures was $290,787.13. Mr. Fantasia also calculated an interest assessment in the sum of $28,214.84 using an interest rate of 9%, the same rate used by Heritage Hill Finance, with respect to the unauthorized funds obtained by the Debtor, for a total of $319,001.97. He also included the $150,000 loan which Lacourse Builders assumed. Mr. Lacourse admitted, however, that he obtained Lot 1 in settlement of that unauthorized encumbrance.

On cross-examination, counsel to Mr. D'Anello attempted to establish that Mr.

Lacourse authorized the expenditures because they were in furtherance of future projects.

Mr. Lacourse emphatically rejected that notion, however.  He explained that he told the

Debtor "whether or not we move forward it's going to determine how this project ends up

and that's as far as we went. He came to me with a couple of other projects and I said, 'I

really want to finish off this road, Crest Road, before we move on to anything else.'"  He

also rejected the suggestion that he and Mr. D'Anello were attempting to obtain work at

the Fatima Shrine and had discussions about that project after problems had arisen at the

Crestwood project.  Mr. Lacourse testified as follows:

> I told him if it wasn't under Lacourse Builders then I wasn't doing the project
> and he can keep the project himself and he agreed that he would just come
> in there, do the project. He wanted a small finder's fee, which we paid him,
> and he was done, that he would have no other future involvement in the
> project.

Mr. Lacourse testified that although the Debtor wanted a $50,000 finder's fee, Lacourse

Builders paid him substantially less.  He stated:

> The original payment was for $5,000 is what he wanted and then he came
> back and he said, "Look, I did a lot of running around. I spent my own
> money" so I gave him a check for ten and that was it. It wasn't monthly
> payments. It wasn't a payment program. Nowhere did we even run up an
> agreement for a payment program.

## III. APPLICABLE LAW

### A. Standing

At the outset, the Court finds that there is a threshold issue of the standing of

Lacourse Builders to seek an exception to discharge of the debt owed to Crestwood

Builders.  Lacourse Builders seeks determinations that the Debtor's conduct constituted

fraud while acting in a fiduciary capacity and embezzlement.  Were this Court to conclude

that there was no express trust created by the Operating Agreement, state law, or the

conduct of the party, the Court would be required to address the issue of whether the

Debtor embezzled funds from Crestwood Builders.  Thus, this Court would be required

to determine whether Lacourse Builders has standing to pursue an exception to discharge

on behalf of Crestwood Builders.

In <u>In re Hayes</u>, 393 B.R. 259 (Bankr. D. Mass. 2008), this Court set forth the law

applicable to standing.  It stated:

> Standing is a "threshold question in every federal case, determining the
> power of the court to entertain the suit." <u>Warth v. Seldin</u>, 422 U.S. 490, 95
> S.Ct. 2197, 45 L.Ed.2d 343 (1975). Hence, "a defect in standing cannot be
> waived; it must be raised, either by the parties or by the court, whenever it
> becomes apparent." <u>U.S. v. AVX Corp.</u>, 962 F.2d 108, 116 n. 7 (1st Cir.1992).

> The inquiry into standing "involves both constitutional limitations on
> federal-court jurisdiction and prudential limitations on its exercise." <u>Warth</u>,
> 422 U.S. at 498, 95 S.Ct. 2197, 45 L.Ed.2d 343. "In its constitutional dimension,
> standing imports justiciability: whether the plaintiff has made out a 'case or
> controversy' between himself and the defendant within the meaning of Art.
> III." <u>Id.</u> Apart from this minimum constitutional mandate, the Supreme
> Court recognizes other limits ". . . on the class of persons who may invoke
> the courts' decisional remedial powers." <u>Id.</u> at 499, 422 U.S. 490, 95 S.Ct. 2197,
> 45 L.Ed.2d 343. These prudential limitations are self-imposed rules of judicial
> restraint:

> > These considerations, which militate against standing,
> > principally concern whether the litigant (1) asserts the rights
> > and interests of a third party and not his or her own, (2)
> > presents a claim arguably falling outside the zone of interests
> > protected by the specific law invoked, or (3) advances abstract
> > questions of wide public significance essentially amounting to
> > generalized grievances more appropriately addressed to the
> > representative branches.

In re Hayes, 393 B.R. at 266–67 (citing In re Newcare Health Corp., 244 B.R. 167 (B.A.P. 1st

Cir. 2000), and In re Shamus Holdings, LLC, No. 08–1030–JNF, 2008 WL 3191315 (Bankr.

D. Mass. Aug. 6, 2008)).  In summary, to establish constitutional standing, a plaintiff must

show that it "suffered an actual, concrete and particularized injury in fact, caused by the

defendant's conduct, which a favorable judgment will likely redress" *See* Fawn Ridge

Partners, LP v. BAC Home Loans Servicing, LP (In re Fawn Ridge Partners, LP), No. 09-

1396, 2010 WL 6452902 at *4 (B.A.P. 10th Cir. Mar. 29, 2010), and for prudential standing,

a plaintiff must establish that it is asserting its own claims rather than the claims of another.

Id. at *5.  Unlike constitutional standing, however, prudential standing can be waived if it

is not properly or timely raised.  Id. If  Lacourse Builders cannot make the required

showings, it lacks both constitutional standing and prudential standing.

Pertinent to the standing issue, Mass. Gen. Laws ch. 156C, § 56, which governs suits

on behalf of limited liability companies, provides:

> Except as otherwise provided in a written operating agreement, suit on behalf of the limited liability company may be brought in the name of the limited company by:
>
>> (a) any member or members of a limited liability company. . . who are authorized to sue by the vote of members who own more than fifty percent of the unreturned contributions to the limited liability company . . . provided, however, that in determining the vote so required, the vote of any member who has an interest in the outcome of the suit that is adverse to the interest of the limited liability company shall be excluded. . . .

Mass. Gen. Laws ch. 156C, § 56. The Superior Court action was not a derivative suit on

behalf of Lacourse Builders as the plaintiff.  Rather, it was commenced by Lacourse

13

Builders against Mr. D'Anello, MD Management and Crestwood Builders as defendants.

In the caption of its adversary proceeding, however, Lacourse Builders identified itself as

a member of Crestwood Builders and indicated that it was bringing suit on behalf of

Crestwood Builders, although it did not elaborate on its derivative standing in the body of

its Complaint.

In White v. Whittle (In re Whittle), 449 B.R. 427 (Bankr. M.D. Fla. 2011), members of

a limited liability company brought an action against the debtor who had been the

managing member.   The debtor moved to dismiss arguing that the plaintiffs lacked

standing to pursue derivative claims properly asserted only by the limited liability

company.   Citing Warth v. Seldin, 422 U.S. 490, 500 (1975), the court concluded that the

essential question was whether the plaintiffs were creditors. In re Whittle, 449 B.R. at 429,

Agreeing with the debtor, the court stated:

> Plaintiffs base their Section 523(a)(4) claim on allegations that Whittle's
> misuse of the LLC's monies amounts to fraud, embezzlement, or larceny.
> Taking these allegations as true, the Court absolutely could draw reasonable
> inferences that SGGUSA was damaged by Whittle's diversion of the LLC's
> funds. SGGUSA indeed may have a claim against Whittle. The alleged facts,
> however, do not support a conclusion that plaintiffs, as members of
> SGGUSA, are owed a debt by Whittle.

Id. at 430.  The court added: "plaintiffs are not entitled to recover directly any damages

that were inflicted on the LLC by Whittle's misuse of LLC property" because they failed

to avail themselves of a Florida statute establishing the right of a member to bring a

derivative action of behalf of a limited liability company.  Id. (footnote omitted). *See also*

Lewis v. Spivey (In re Spivey), 440 B.R. 539, 545 (Bankr. W.D. Ark. 2010) (stating that

14

although Arkansas limited liability company statute imposed fiduciary duties upon members to account to the company, one member had no fiduciary duties to other members and members could not "in their own right, establish a claim for embezzlement, and concluding that members lacked standing to seek § 523(a)(4) exception to discharge.").

Based upon the evidence presented and in view of the applicable law set forth above, the Court concludes that the evidence established that Lacourse Builders through its manager, Mr. Lacourse, effectively took over the management, operations and obligations of Crestwood Builders and is now suing Mr. D'Anello on behalf of Crestwood Builders and itself. Lacourse Builders would not have been able to obtain the required vote of the other member of Crestwood Builders, MD Management, an entity managed by Mr. D'Anello's spouse, to commence a derivative suit. Section 56 of Mass. Gen. Laws ch. 156 recognizes the futility of obtaining authorization to sue derivatively in certain situations where members have adverse interests. Accordingly, the Court finds there is no impediment to Lacourse Builders seeking and obtaining relief on its own behalf and derivatively on behalf of the Crestwood Builders because MD Management's interest was adverse to those of Lacourse Builders as a result of the relationship between MD Management and Mr. D'Anello. Moreover, the Court finds that Mr. D'Anello waived any issue relating to the prudential standing of Lacourse Builders by failing to raise it either before or after trial, particularly where the caption of the Complaint filed by Lacourse Builders indicates that it was filed on its own behalf and on behalf of Crestwood Builders.

In Billings v. GTFM, LLC, 449 Mass. 281, 289 n.18, 867 N.E.2d 714 (Mass. 2007), the

15

court observed:

> Here there was no provision in the operating agreement related to derivative
> suits. Nor was there evidence of any vote authorizing the suit. The
> defendants never asserted the lack of a vote as grounds for dismissal. Even
> if they had, the argument would likely have failed. As the derivative claims
> were against all other members of GTFM, all of them had "an interest in the
> outcome of the suit that is adverse to the interest of the limited liability
> company" (at least insofar as that interest was described in the complaint,
> taking the allegations made therein as true). Thus Billings would be the only
> member eligible under the statute to vote on authorizing a suit against all
> other members for breach of fiduciary duty. He impliedly did so by filing the
> complaint.

Billings v. GTFM, LLC, 449 Mass. at n.18.   The circumstances in Billings are similar to those

present in this case.  Thus, Lacourse Builders has derivative standing to seek an exception

to discharge, particularly where Mr. D'Anello did not raise the issue of standing and must

be deemed to have waived any reliance on lack of standing.

B. 11 U.S.C. § 523(a)(4)

1. Fraud While Acting in a Fiduciary Capacity

The United States Bankruptcy Appellate Panel for the First Circuit in Petrucelli v.

D'Abrosca (In re D'Abrosca), No. 09–01070–ANV, 2011 WL 4592338 (B.A.P. 1st Cir. Aug.

10, 2011), extensively reviewed the requirements for the existence of a fiduciary

relationship under 11 U.S.C. § 523(a)(4), which excepts from discharge debts "for fraud or

defalcation while acting in a fiduciary capacity, embezzlement or larceny."  It stated:

> A fiduciary relationship exists when there is an express or technical trust. See
> [Rutanen v. Baylis (]In re Baylis[)], 313 F.3d [9] at 17 [(1st Cir. 2002)]. A trust
> imposed by law due to malfeasance would not constitute a trust in this
> context. Mullen v. Jones (In re Jones), 445 B.R. 677, 707 (Bankr. N.D. Tex.
> 2011). Moreover, the "broad definition of fiduciary under nonbankruptcy

16

law—a relationship involving trust, confidence, and good faith—is inapplicable in the dischargeability context." Honkanen v. Hopper (In re Honkanen), 446 B.R. 373, 378–79 (B.A.P. 9th Cir. 2011) (citing Cal–Micro, Inc. v. Cantrell (In re Cantrell), 329 F.3d 1119, 1125 (9th Cir. 2003)). Neither party suggest an express trust existed in this case.

A technical trust is one that arises under statute or common law. *See* Farley v. Romano (In re Romano ), 353 B.R.738 (Bankr. D. Mass. 2006) (citing M–R Sullivan Mfg. Co., Inc. v. Sullivan (In re Sullivan), 217 B.R 670, 674 (Bankr. D. Mass.1998)); Collenge v. Runge (In re Runge), 226 B.R. 298, 305 (Bankr.D.N.H.1998). State law is relevant in considering whether such a trust exists. *See* A.J. Rinella & Co. v. Bartlett (In re Bartlett), 397 B.R. 610, 620 (Bankr. D. Mass.2008); LaPointe v. Brown (In re Brown ), 131 B.R. 900, 905 (Bankr. D. Me. 1991) ("one must . . . ascertain whether the relationship was imbued with attributes giving rise to, in substance, a trust"). A state law fiduciary relationship may not rise to the level of 11 U.S.C. § 523(a)(4) unless "state law imposes the duties of a trustee on a party." McDowell v. Stein, 415 B.R. 584, 595 (S.D. Fla.2009); *see also* Fowler & Peth, Inc. v. Regan (In re Regan), 477 F.3d 1209, 1211 (10th Cir.2007).

In re  D'Abrosca, 2011 WL 4592338 at *5.  The bankruptcy appellate panel added:

Case law in this circuit also provides an alternative theory for determining fiduciary capacity. *See* In re Romano, 353 B.R. at 764. In Romano, Judge Feeney addressed whether two 50 percent shareholders owed each other a fiduciary duty under 11 U.S.C. § 523(a)(4). Id. at 763. Relying upon O'Shea v. Frain (In re Frain), 230 F.3d 1014 (7th Cir. 2000), she explained that a "fiduciary capacity for purposes of § 523(a)(4) could be established by the existence of a contract and substantial ascendancy of one shareholder over another as an alternative to an express or technical trust." In re Romano, 353 B.R. at 762–63. Because one shareholder did not hold a position of ascendency over the other, Judge Feeney ruled there was no fiduciary capacity between the two shareholders.

In re  D'Abrosca, 2011 WL 4592338 at *6.[6]

_____

[6] The bankruptcy appellate panel further observed:

Her holding is in accordance with In re Brown, 131 B.R. at 905. In that case, Judge Haines explained that "although it cannot be questioned that, in a general state law sense, Brown [one of two shareholders] was a

The bankruptcy appellate panel also considered the fiduciary duties owed to and

corporate fiduciary, one must look further to ascertain whether the relationship was imbued with attributes giving rise to, in substance, a trust." Id. Because the debtor was the sole officer, kept the books, and managed the accounts and assets, Judge Haines ruled that his relationship was "in substance no different than that of a trustee to its trust, a guardian to its ward." Id.

Many other bankruptcy courts have grappled with the issue of whether state fiduciary duties of corporate officers and directors satisfy the requirements of fiduciary capacity for purposes of 11 U.S.C. § 523(a)(4). See In re Sullivan, 217 B.R. at 676; see also In re Cantrell, 329 F.3d at 1127 ("California case law has consistently held that while officers possess the fiduciary duties of an agent, they are not trustees with respect to corporate assets."); Milburn Partners LLC v. Miles (In re Miles), 2011 WL 1124183 (Bankr. N.D. Ga. 2011) (holding that status as corporate officer alone is insufficient to establish fiduciary capacity); Murray v. Woodman (In re Woodman ), No. 09–06052, 2011 WL 1100264 (Bankr. D. Idaho Mar. 22, 2011) (state fiduciary relationship did not rise to fiduciary capacity under subsection (a)(4)); McDowell v. Stein, 415 B.R. at 596 (explaining that because "New York law imposes sufficient trustee-like obligations on co-owners of a closely held corporation to constitute a fiduciary duty under § 523(a)(4)," collateral estoppel was proper); Fish v. Sadler (In re Sadler), No. 07–11333, 2007 WL 4199598, *2 (Bankr. N.D. Fla. Nov. 26, 2007) ("However, there is no Florida statute that establishes a trust to meet the bankruptcy's standard of fiduciary capacity for a corporate director or officer[.]"); Dominie v. Jones (In re Jones), 306 B.R. 352, 354–55 (Bankr. N.D. Ala. 2004) (ruling, despite close corporation officer and controlling shareholder, duty did not constitute technical trust); Michigan Web Press, Inc. v. Wilcox (In re Wilcox), 310 B.R. 689, 696–97 (Bankr. E.D. Mich. 2004); Streibick v. Murrell (In re Murrell ), No. 03–21239, 2004 WL 1895200 *8 (Bankr. D. Idaho Aug. 12, 2004) ("However, Plaintiffs have not shown that any of the Idaho cases would establish a trust or otherwise impose fiduciary duties sufficient to meet the bankruptcy standard required for a § 523(a)(4) claim under applicable federal law."); Woodstock Housing Corp. v. Johnson (In re Johnson), 242 B.R. 283 (Bankr. E.D. Pa. 1999) ("The vast majority of cases . . . hold that corporate directors and officers are § 523(a)(4) fiduciaries of their corporations.").

In re  D'Abrosca, 2011 WL 4592338 at *6.

by members of limited liability companies, noting a split of authority.  *See* D'Abrosca, 2011

WL 4592338 at *7 (citing Davis v. Olson (In re Olson), No. 10–2056, 2011 WL 1832751, *5

(Bankr. W.D. Mo. May 13, 2011) (declining to find "fiduciary capacity" between members

of a limited liability company because neither operating agreement nor statute established

a relationship sufficient for § 523(a)(4)); Walker v. Silvonen (In re Silvonen ), No. 10–00050,

2011 WL 2837507 (Bankr. D. Mont. July 14, 2011) (same), and Ragsdale v. Haller, 780 F.2d

794, 796 (9th Cir. 1986)(concluding California case law established partners were trustees

over partnership assets)).  *See also* Freid v. Gordon, No. 09-10928-DJC, 2011 WL 1157891 at

*4 (D. Mass. Mar. 25,  2011)("Like corporate directors, managers of a limited liability

company owe a fiduciary duty of care and loyalty to the company and its members.").

### 2. Embezzlement

The United States Court of Appeals for the First Circuit in Sherman v. Potapov (In

re Sherman), 603 F.3d 11 (1st Cir. 2010), observed the following about proof of

embezzlement for purposes of 11 U.S.C. § 523(a)(4):

> There being no definition of embezzlement in § 523 or elsewhere in the
> Bankruptcy Code, we assume that Congress wrote with the common law in
> mind, Neder v. United States, 527 U.S. 1, 23, 119 S.Ct. 1827, 144 L.Ed.2d 35
> (1999), and United States v. Young, 955 F.2d 99 (1st Cir.1992), will suffice for
> an explanation of the traditional elements of embezzlement. Embezzlement
> is "the fraudulent conversion of the property of another by one who is
> already in lawful possession of it." Id. at 102 (internal quotation marks
> omitted). Thus, to amount to embezzlement, conversion must be committed
> by a perpetrator with fraudulent intent, and the question is whether the
> bankruptcy court found it on Sherman's part. Young is helpful again, in its
> example of embezzlement by using entrusted money for the recipient's own
> purposes in a way he knows the entrustor did not intend or authorize. Id. It
> is knowledge that the use is devoid of authorization, scienter for short, *see*

19

> Palmacci v. Umpierrez, 121 F.3d 781, 786 (1st Cir.1997), that makes the
> conversion fraudulent and thus embezzlement, and it is just this knowledge
> that the bankruptcy court found that Sherman had as a participant in the
> conversion.

In re Sherman, 603 F.3d at 13. There are three elements to proof of embezzlement: "(1)

property rightfully in the possession of a nonowner; (2) nonowner's appropriation of the

property to a use other than which [it] was entrusted; and (3) circumstances indicating

fraud." Sherman v. Potapov, 403 B.R. 151, 157 (D. Mass. 2009), aff'd, 603 F.3d 11 (1st Cir.

2011)(citing In re Littleton, 942 F.2d 551, 555 (9th Cir. 1991)). See also Farley v. Romano (In

re Romano ), 353 B.R.738, 765-66 (Bankr. D. Mass. 2006).

In the context of the embezzlement by a manager of a limited liability company, the

court in Wallner v. Liebl (In re Liebl), 434 B.R. 529 (Bankr. N.D. Ill. 2010), considered a

derivative claim on behalf of a limited liability company, finding that the debtor

appropriated the limited liability company's property and did so with fraudulent intent.

The court observed that under Illinois law, like Massachusetts law, a plaintiff may maintain

a derivative action on behalf of a limited liability company when members or managers

with authority to sue have refused to bring an action or when an effort to cause those

members or managers to bring an action likely would be unsuccessful. Id. at 536. The court

entered judgment in favor of the limited liability company for all funds and property,

tangible and intangible taken for the debtor's personal use and benefit.

**IV. DISCUSSION**

Exceptions to discharge are narrowly construed in favor of the debtor, and the

burden of proof is on the creditor to prove all applicable elements by a preponderance of the evidence. *See* McCrory v. Spigel (In re Spigel), 260 F.3d 27, 32 (1st Cir.2001); Grogan v. Garner, 498 U.S. 279, 286–87, 111 S.Ct. 654, 112 L.Ed.2d 755 (1991).

Although Lacourse Builders established the existence of fiduciary duties of care and loyalty on the part of Mr. D'Anello as the manager of Crestwood Builders which were owed to its members, *see* Freid v. Gordon, 2011 WL 1157891 at *4, the Court is unconvinced that those duties, without more, satisfy the requirement of § 523(a)(4) for the existence of an express trust, not a trust *ex malificio*.  In Farley v. Romano (In re Romano), 353 B.R. 738 (Bankr. D. Mass. 2006), this Court observed:

> [T]he existence of fiduciaries duties alone does not establish fiduciary capacity for purposes of § 523(a)(4), Denton v. Hyman (In re Hyman), 320 B.R. 493, 510 (Bankr.S.D.N.Y.2005), *aff'd* 335 B.R. 32 (S.D.N.Y.2005), although "[m]ost courts today . . . recognize that the 'technical' or 'express' trust requirement is not limited to trusts that arise by virtue of a formal trust agreement, but includes relationships in which trust-type obligations are imposed pursuant to statute or common law." LSP Inv. Partnership v. Bennett (In re Bennett), 989 F.2d 779, 784–85 (5th Cir.1993), *cert. denied*, 510 U.S. 1011, 114 S.Ct. 601, 126 L.Ed.2d 566 (1993).

In re Romano, 353 B.R. at 761.  Unlike the situation in In re Frain, 230 F.3d 1014 (7th Cir.2000), the Court finds that the Operating Agreement for Crestwood Builders was not structured in such a way as to concentrate overwhelming power in the Debtor's hands.  In Frain, which involved a closely held corporation with three shareholders where the chief financial officer, Frain, owned 50% of the shares, had superior knowledge of day-to-day operations and exploited that position, the United States Court of Appeals for the Seventh Circuit concluded that "a fiduciary relationship was created by the structure of the

21

corporation under the shareholder agreement," rejecting the debtor's contention that the violation of a contract entered into among equals was not covered by § 523(a)(4). Summarizing its holding, the Seventh Circuit stated: "A contract was necessary to the existence of a fiduciary relationship, but the obligations of the contract were not the source of the fiduciary relationship. The source of the fiduciary relationship was Frain's substantial ascendancy over [the minority shareholders]." 230 F.3d at 1018.  As this Court stated in <u>Romano</u>, "the Seventh Circuit in <u>Frain</u> established that a fiduciary capacity for purposes of § 523(a)(4) could be established by the existence of a contract and  substantial ascendancy of one shareholder over another as an alternative to an express or technical trust." 353 B.R. at 762-63.

The Court finds that Lacourse Builders failed to establish that Mr. D'Anello held substantial ascendancy over it (or, for that matter, Mr. Lacourse), particularly where there was a substantial and logical division of labor and responsibilities between Mr. Lacourse and Mr. D'Anello, and Mr. Lacourse expeditiously asserted the rights of Lacourse Builders for an accounting when subcontractors alerted him to problems involving payment of invoices.  Moreover, Mr. Lacourse on behalf of Lacourse Builders rejected Mr. D'Anello's attempts to expand their relationship and use the Crestwood Builders entity for other projects.  His substantial responsibilities for hiring subcontractors, ordering materials and supervising the construction site coupled with his insistence that any future ventures depend on the outcome of the Crestwood project established that Mr. D'Anello did not have the ability to exercise "substantial ascendancy" over either Lacourse Builders or

22

Crestwood Builders.

With respect to embezzlement, however, the Court finds that Lacourse Builders satisfied its burden of proof by a preponderance of the evidence. The testimony of Mr. Lacourse and, particularly, the testimony of, and report prepared by, Mr. Fantasia unequivocally established that the Debtor, as manager of Crestwood Builders, appropriated monies entrusted to him from the proceeds of loans from Heritage Hill Finance, the sale of Lot 3 and other sources for his own benefit, paying not only himself but his nephew, his daughter's boyfriend and costs unrelated to the project in Framingham, including substantial sums associated with a failed development project known as Gateway On The River, LLC.

Although the Court had no direct evidence of fraudulent intent, the circumstantial evidence surrounding the appropriation of funds by the Debtor compels the conclusion that the appropriations were made with fraudulent intent. The checks written by the Debtor to individuals and entities that benefitted him and conferred no benefit on Crestwood Builders compels the conclusion that he had the requisite scienter and Crestwood Builders and Lacourse Builders were substantially harmed by his conduct.

In addition, the Court draws a negative inference from the Debtor's failure to attend and testify at the trial.[7] In <u>Bogosian v. Woloohojian Realty Corp.</u>, 323 F.3d 55 (1st Cir. 2003), the United States Court of Appeals for the First Circuit observed:

_____

[7] Mr. D'Anello also failed to file a post-trial brief setting forth reasons why the debt to Lacourse Builders should not be excepted from discharge.

The "missing witness" rule permits, rather than compels, the factfinder to draw an adverse inference from the absence of a witness, *see* Niziolek v. Ashe, 694 F.2d 282, 292 (1st Cir. 1982), particularly where the factfinder concludes that the party who requested the adverse inference failed to subpoena a witness otherwise available to testify, *see* Trump Plaza Assocs. v. Poskanzer (In re Poskanzer), 143 B.R. 991, 998 (Bankr. D .N.J. 1992)).

Bogosian, 323 F.3d at 67.  *See also* SE Nicholls, Inc. v. McGowan (In re McGowan), 75 B.R.

10 (Bankr. N.D.N.Y. 1986).  The decision in  McGowan is on point.  In that case, the court

stated:

> While adequate notice was given McGowan of the trial held before the Court on February 19, 1986, McGowan failed to appear and present testimony on his behalf. As bankruptcy adversary proceedings are civil proceedings, an adverse inference may be drawn against a party when they refuse to testify in response to probative evidence offered against them. *cf.,* Baxter v. Palmigiano, 425 U.S. 308, 318, 96 S.Ct. 1551, 1558, 47 L.Ed.2d 810, 821, (1976) (discusses inappropriateness of this inference in criminal cases). The Court, absent information from McGowan to the contrary, can only infer that his failure to appear was deliberate, and further, that his testimony would have been unfavorable to his case. Stoumen v. Commissioner, 208 F.2d 903, 907 (3d Cir.1953).
>
> Based upon the evidence presented, particularly the testimony of Klune and Mitchell, the Court finds that McGowan intentionally stole $57,078.66 from Nicholls during the course of his employment.  . . .
>
> ***
>
> The evidence presented clearly establishes McGowan's actual intent to embezzle certain of the sums placed in his control, with the debt thus nondischargeable pursuant to § 523(a)(4) of the Code. While the Court believes sufficient direct proof was proffered in this regard, clearly the requisite intent may be established inferentially by circumstantial proof. New York Credit Men's Adjustment Bureau, Inc. v. Adler, 2 B.R. 752, 756 (S.D.N.Y.1980); Lesser v. Jewel Factors Corp., 470 F.2d 108, 110 (2d Cir.1972).

In re McGowan, 75 B.R. at 13-14.

24

Although Lacourse Builders did not subpoena the Debtor to appear and testify at trial, the Debtor in the parties' Joint Pretrial Memorandum represented that "[t]he Defendant . . . expects to testify on his own behalf." The Court draws a negative inference from the Debtor's failure to appear and to testify at trial. His absence bolsters the Court's conclusion the he misappropriated monies belonging to Crestwood Builders that were rightfully in his possession with fraudulent intent.

## V. CONCLUSION

In view of the foregoing, the Court shall enter a judgment in favor of Lacourse Builders and on behalf of Crestwood Builders, derivatively, and against the Debtor in the sum of $319,001.97.

By the Court,

Joan N. Feeney
United States Bankruptcy Judge

Dated:  August 7, 2012

25